**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

BRIAN D. HIGGINS,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-4084-MWB

**REPORT AND RECOMMENDATION**

—————————————

*TABLE OF CONTENTS*

**I.**    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.**   **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

    **A.**   *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    **B.**   *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*    *Introductory facts and Higgins's hearing testimony* . . . . . . . . **3**
        *2.*    *Higgins's medical history* . . . . . . . . . . . . . . . . . . . . . . . . **8**
        *3.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**III.**  **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . . **28**

    **A.**   *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **28**
    **B.**   *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . **31**

**IV.**   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

**V.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

# I. INTRODUCTION

The plaintiff Brian D. Higgins ("Higgins") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Higgins claims the ALJ erred in failing to consider the effects of Higgins's non-exertional impairments on his functional capacity, and in failing to obtain the testimony of a Vocational Expert. (*See* Doc. No. 9)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On September 30, 2002, Higgins protectively filed applications for DI and SSI benefits, alleging a disability onset date of February 1, 2001.[1] (*See* R. 77-79, 391-96) Higgins claims he is disabled due to "ruptured disc and herniated disc in [his] lower back," deafness in his left ear, and history of a motor vehicle accident on February 1, 2001.[2] (R. 105) He alleges he is "unable to lift more than 20 pounds," is "restricted in twisting and bending," and has "limited functioning of [his] hands [and] left leg numbness." (*Id.*) He claims he attempted to work for about a week after his car accident, but he was "unable to perform the job due to [his] condition," and no one would hire him with his current restrictions. (*Id.*) In addition, although not listed on his original applications, Higgins also has been treated for a bipolar mood disorder and depression, and these conditions were considered by the ALJ as part of his decision. (*See, e.g.*, R. 18) Higgins's applications were denied initially and on reconsideration. (R. 41-48, 60-63, 65-68, 397-402)

---

[1] The record also contains jurisdictional documents and evidence relating to previously-filed applications for DI and SSI benefits. The previous claims were denied, and Higgins did not appeal. (*See* R. 15, 27-40, 59-57, 375-90)

[2] The application form shows the year of the accident to be 2000, rather than 2001. This clearly was a scrivener's error because all of the other records, and Higgins's hearing testimony, indicate his accident was in 2001.

Higgins requested a hearing (R. 69), and a hearing was held before ALJ Bert C. Hoffman, Jr. on June 15, 2004. (R. 403-33) Higgins was represented at the hearing by non-attorney Lee Sturgeon. Higgins was the only witness at the hearing.

On July 29, 2004, the ALJ ruled Higgins was not entitled to benefits. (R. 12-21) Higgins appealed the ALJ's ruling, and on May 25, 2005, the Appeals Council denied Higgins's request for review (R. 5-7), making the ALJ's decision the final decision of the Commissioner.

Higgins filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Higgins's claim. Higgins filed a brief supporting his claim on October 13, 2005. (Doc. No. 9) The Commissioner filed a responsive brief on December 9, 2005. (Doc. No. 10) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Higgins's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Higgins's hearing testimony

Higgins was born in 1962, making him forty-two years old at the time of the hearing. He graduated from high school, but he stated he has a learning disability and was in special education courses throughout his schooling. He explained he has difficulty understanding what he reads, but he usually is able to learn "by hands on." (R. 406-07)

After leaving high school, Higgins joined the Air Guard. He was placed in technical school to learn auto mechanics, but he was honorably discharged after less than a year because he "couldn't quite comprehend the learning part of it." (R. 407-08)

Higgins has been employed off and on over the past fifteen years, but stated he has never stayed at one job for very long. His longest job was as a bartender, which he did for about a year-and-a-half. His most recent paid job was working at McDonald's. More recently, he worked on an unpaid basis on his parents' eighty-acre farm, but he stated they stopped planting anything on the farm after he got hurt, and eventually his parents had to sell their farm. (R. 408-09)

At the time of the hearing, Higgins's father was eighty years old and his mother was seventy-eight or seventy-nine years old. His father retired from farming about ten years before the hearing. While his father was still farming, Higgins helped with weed control and other chores on the farm. He stated he had a motor vehicle accident in 2001, and he has been unable to do any work on the farm since that time. (R. 410-11) Higgins stated he feels it is his fault that his parents had to sell their farm, because he was no longer able to take care of the place. He stated this adds to his depressed mood and makes him feel bad that he could not care for his parents on their farm. (R. 428-29)

Besides working at McDonald's and working on his parents' farm, Higgins has also done some mechanic-type work and warehouse work during the past fifteen years. He also drove a truck for awhile, and did other basic labor work. He was licensed as a certified nursing assistant at one time, but his license is no longer current. (R. 411-12)

Higgins had to turn his head from time to time during questioning because of hearing difficulties. He stated he is completely deaf in his left ear. (R. 413)

Higgins apparently had an abrasion or cut on his forehead at the time of the hearing. The ALJ asked how the injury had occurred, and Higgins stated he was coming out of his church the previous week and he fell when his left leg "gave out" on him. (*Id.*) He stated he probably should have had stitches, but he "just went home, cleaned it up and [had] been taking care of it [himself]." (*Id.*) He indicated he was bandaging the wound at least every other day. (R. 413-14)

4

Higgins went to the hospital during the week prior to the hearing because he was having chest pains. He was at his sister's home watching television with her when he started feeling the chest pains. His father came over and took him to the hospital, where he was admitted for observation and testing. According to Higgins, doctors determined he did not have a cardiac problem, but he had "an infection between tissue and the sternum." (R. 415)

Higgins stated that since his accident in February 2001, he has had trouble sitting for very long or walking very far, and he loses his concentration easily. He does not believe he could have performed any of the farm work he used to do because "the bouncing around on any of the farm machinery would just . . . [be] unbearable for [his] back." (R. 415) He also does not believe he could have performed any of his other past work because of the prolonged standing required in those jobs. He indicated he can only sit for fifteen to twenty minutes before the pain becomes almost unbearable in his low back, and he indicated he would like to stand and move around during the hearing, if possible. The ALJ told Higgins he could stand and move about as long as he could be heard. (R. 415-16)

Higgins stated his pain radiates from his low back down into his legs, worse on the left than the right. According to Higgins, pin prick tests of his legs have shown his left leg has no sensation in it. He stated doctors have pricked his leg hard enough to make it bleed but he still did not feel anything. (R. 417) The loss of sensation is present all the time. In addition, he always has "kind of a dulled annoying pain in that left leg." (R. 418)

Higgins indicated he can stand for about ten minutes before his back begins to hurt, and then he will sit until he becomes uncomfortable, and then he will stand again. He helps do the family's dishes, but he is unable to stand at the sink for more than ten minutes at a time without experiencing pain on a level of nine or ten on a ten-point scale. (R. 419-

20) In addition to having to change positions frequently due to pain, Higgins indicated he has "to be able to get up and move around" because he is "awful claustrophobic." (R. 420) He stated he would be unable to work for eight hours even if he could change from sitting to standing frequently because he also has to lay down at times. (*Id.*) He estimated he could tolerate alternate sitting and standing for about three hours at a time. (R. 420-21)

Higgins estimated he could lift ten pounds occasionally. He stated he lifts a ten-pound bag of dog food periodically, but he does not think he could lift ten pounds regularly without hurting his back. (R. 423-24) He stated his symptoms had not improved in the year-and-a-half prior to the hearing, and on some days, his symptoms are worse than on other days. (R. 423-24)

Higgins stated he takes Ibuprofen and Tylenol for pain. He also takes Trileptal, which he stated he takes for diagnoses of bipolar disorder, depression, claustrophobia, and anxiety.[3] (R. 421) He also takes Paxil (an anti-anxiety and antidepressant medication), and Effexor (an antidepressant). (R. 421) He stated he had been receiving psychiatric treatment for over a year prior to the hearing, but he had been depressed and had seen counselors before that time. He stated he "can't take being in a room for very long" before he has to "get out and get air"; he does not like to be around people and will become short-tempered; he has problems with his mind drifting, causing him to lose track of what he is doing; and he feels depressed, like he is "no good to be around nobody," and has no self-esteem. (R. 422) He sees a counselor at a mental health center and has tried several medications, none of which has worked well for him. (R. 422-23) He also stated his sessions with counselors and psychiatrists have not helped him because he will "go in and talk about [his] problems" but they never go away. (R. 423) He stated his mental

---

[3]The court notes Trileptal is an anti-seizure medication used to treat partial seizure disorder. *See* www.rxlist.com, "Trileptal" (Mar. 22, 2006).

problems are present every day, and most of the time, he does not even want to get out of bed, but he is unable to stay closed up in his room due to his claustrophobia. (R. 424)

Higgins lives with his parents outside of Sioux City. He has lived with his parents even during periods of employment. He goes to visit his sister in town at least once a week, but he does not visit other friends or family. He has two daughters, ages twelve and seventeen, but he does not visit them. His older daughter lives in South Sioux City, Nebraska, and has a baby, and Higgins's parents pick up the baby periodically and bring her to the farm for a day or two. Higgins stated he is uncomfortable around his daughter's boyfriend, so he does not visit in her home. (R. 410, 426-27)

Higgins stated he goes fishing when he can. He last fished about two months before the hearing, "down along the river" with his parents. (R. 427-28)

The ALJ asked Higgins when he last had an alcoholic drink. Higgins stated he had not had even a sip of alcohol for six years. His last drink was when he was "working at Dakota Rose," and he was stopped for driving while impaired on three occasions. He was still paying on his last fine, and stated that because he has been unable to work, the court has given him an indefinite extension of time to pay his last fine. (R. 428-29)

The ALJ noted that when Higgins filed his applications for benefits, he did not include any mental health problems in his alleged impairments. He asked if Higgins had only sought mental health treatment after he retained counsel. Higgins stated he had tried to see a mental health provider for some time due to his depression, but it was possible he only began seeing a counselor after retaining counsel. His representative stated "that would only be based on the information [Higgins] gave [him] which includes the November 2000 information from [Higgins's] physician's assistant which diagnosed him way back then with depression and anxiety." (R. 430) Higgins's representative indicated Higgins "clearly to [him], had a learning disability and those symptoms and so [the

representative] may very well have suggested to [Higgins that he see a mental health provider.]" (*Id.*)

## 2.   *Higgins's medical history*

In early October 2000, Higgins underwent a stress test to evaluate his complaints of chest discomfort. His stress echocardiogram was normal. (R. 364) On November 13, 2000, he was seen by physician's assistant David Faldmo for an intake evaluation at Siouxland Community Health Center ("SCHC"). Higgins complained of recurrent diarrhea for one year, and occasional light-headedness and chest pains. He stated ER physicians had told him he was having panic attacks, and he complained of being under a tremendous amount of stress. He also complained of occasional erectile dysfunction; feeling like he was going to pass out at times; and "problems with mood swings, feelings of depression, and sometimes feelings of more just generalized anxiousness." (R. 188) He was started on Wellbutrin for his symptoms of depression, and was given materials to take stool samples to evaluate his ongoing diarrhea. (R. 189)

Higgins saw P.A. Faldmo for follow-up on December 6, 2000, and reported that since he started taking Wellbutrin, his diarrhea had ceased. He claimed he had taken stool samples to Public Health as directed, but Public Health had no record of receiving the samples. Higgins stated his depression and anxiety were "much better since being on the Wellbutrin," and he was "very pleased with the results." (R. 290) He planned to get Viagra for impotence through an indigent program. (*Id.*) He was given samples of Wellbutrin and Viagra at this visit, and again on December 29, 2000. (*Id.*)

Higgins next saw P.A. Faldmo on March 2, 2001, complaining that his diarrhea had returned. He stated he was under a lot of pressure. He reported that he had been involved in a motor vehicle accident about a month earlier, and he had just returned to work. He

stated he thought Wellbutrin was helping him. He was told to continue taking Wellbutrin, and to return for follow-up in two to three months or as needed. (R. 289)

On March 20, 2001, Higgins underwent an MRI of his lumbar spine to evaluate his complaint of right low back pain shooting down his entire right leg. The pain apparently had begun on March 17, 2001. (R. 287) The MRI showed "mild superior D9 compression, age indeterminate, favor subacute to chronic"; "L2-3 and L3-4 moderate disc desiccation with mild L2-3 and minimal L3-4 bulging annulus"; "[n]o lumbar central canal stenosis or disc herniation"; "[v]entral disc herniation anterior to spine D11-12, right greater than left, usually incidental"; "[n]ormal conus medullaris"; and "[m]ild cystic nerve root sleeve dilatation left S3, also usually incidental, and does not correlate with right-sided symptoms." (*Id.*)

Higgins returned to SCHC on March 22, 2001, complaining of back pain and right leg pain for five days. He stated he had seen a chiropractor on and off since February 2, 2001. According to Higgins, the chiropractor had sent him to the ER on March 21, 2001, for pain medication, and while he was there, an MRI was performed.[4] He was treated in the ER with Darvocet and Ibuprofen, but got no relief. Upon examination, Higgins demonstrated positive straight-leg-raising on the right.[5] He could walk on his toes but not on his heels. Most of his pain was in the right lower lumbar area radiating down his leg. He was diagnosed with a lumbar strain with some radicular symptoms. He was told to continue taking Ibuprofen, discontinue the Darvocet, and begin Vicodin. In addition, he was given an injection of Toradol in the doctor's office. Notes indicate P.A. Faldmo wanted to order an epidural flood, but Higgins had no insurance. (R. 286, 289)

---

[4]The MRI report is dated March 20, 2001, but when Higgins saw his doctor on March 22, 2001, he stated he had been to the ER the previous day when the MRI was performed. Evidently, one of these dates is incorrect.

[5]A positive finding on the straight-leg-raising test, or Lasegue's maneuver, generally suggests inflammation of the sciatic nerve at the lumbar spine or low back. *See, e.g.*, "The Examination Guide for the Chiropractic Health Provider" (http://www.chirobooks.com/exam.html).

Higgins returned for follow-up on March 26, 2001. He reported sleeping a bit better but still complained of significant pain with radiation into his right leg. He was given a note to excuse him from work for the rest of the week. (R. 284)

On March 27, 2001, Higgins was referred to the Mercy Pain Clinic for evaluation of his increasing back pain radiating down his right leg, secondary to his motor vehicle accident. (R. 285-86)

Higgins returned to SCHC for follow-up on April 3, 2001. He apparently had been seen in the Mercy Pain Clinic and had received an epidural flood, which he reported had resolved his right leg numbness and pain. However, he stated he had been at work earlier in the day, had twisted while he was cooking, and had felt a pop in his back. He complained of pain and tingling into his left leg. On examination, he demonstrated increased pain with forward flexion. He was diagnosed with a lumbar strain with radicular symptoms into his left leg. Notes indicated Higgins was told that "he really needs to keep to the work restrictions as dictated by the anesthesiologist at the Pain Center and if his work can't find duties that can follow these guidelines he needs to not work." (R. 283) The court has been unable to locate the work restrictions in the record.

Higgins was seen again at SCHC on April 6, 2001. He continued to complain of pain radiating down his left leg. Notes indicate a Dr. Mohsin at the Mercy Pain Management Clinic had told Higgins he should see a neurologist or neurosurgeon. P.A. Faldmo switched Higgins from Vicodin to OxyContin; switched him from Soma to Skelaxin; and told him to continue taking Neurontin, which apparently was prescribed at the Pain Management Center. He was referred to Thomas J. Clark, D.O., a neurologist, for further evaluation of his back pain. (R. 281-82)

Higgins returned to SCHC on April 13, 2001, complaining that the OxyContin was causing him some constipation. He stated he was not sleeping well due to pain, and stated he had been off work for awhile. He also stated he had stopped taking the Neurontin due

to side effects. He was told to continue with the OxyContin and Skelaxin, and to try a lower dose of the Neurontin. He was given a work excuse for another week. Colace and Milk of Magnesia were prescribed to help with the constipation. (R. 280)

On April 17, 2001, Higgins saw Dr. Clark for evaluation. Higgins gave a history that included his motor vehicle accident and the incident where he twisted and heard a "pop" in his back while working. He complained of "persistent low back pain with pain and paresthesias down the posterior aspect of the left leg"; numbness in his left leg; and lack of complete control of his leg, stating his left knee would buckle when he stepped down. (R. 193) Upon examination, he exhibited positive straight-leg-raising on the left in both the seated and supine positions. He had loss of sensation in his entire left leg and diminished vibratory sense on the left. He had a paravertebral muscle spasm and demonstrated decreased range of motion in his lumbar spine, as well as pain and tenderness at T12 to palpation. Dr. Clark indicated Higgins's symptoms were "suggestive of nerve root dysfunction on the left." (R. 194) He noted Higgins had "no obvious neurologic deficits, although he ha[d] had giveway weakness and inconsistent sensory changes in the leg." (*Id.*) Dr. Clark prescribed Amitriptyline to be taken a night; told Higgins to stay off work for two more weeks; and directed him to continue taking OxyContin and Carisoprodol. He ordered a repeat MRI of Higgins's lumbosacral spine. (R. 194-95)

Higgins returned to see P.A. Faldmo for follow-up on April 20, 2001. His symptoms remained unchanged, and Higgins stated he was depressed and despondent. P.A. Faldmo noted Higgins was having symptoms of depression even before his car accident. He stopped the Wellbutrin and started Higgins on Effexor. Higgins was directed to attend his physical therapy as prescribed by Dr. Clark. (R. 280)

Higgins started physical therapy on April 23, 2001. He was scheduled for three visits weekly for four weeks, with goals of being able to walk for ten minutes continuously

within two weeks; tolerate the initiation of an exercise program for his low back and abdomen within two weeks; sleep through the night without awakening due to low back pain within four weeks; and return to work within four weeks.  (R. 271)

Higgins saw Dr. Clark for follow-up on April 24, 2001.  The doctor observed significant spasms in Higgins's paravertebral muscles in the lumbar area.  He diagnosed Higgins with a possible herniated disk in the lumbar spine with significant paravertebral spasm.  He ordered a repeat MRI, switched Higgins from Celebrex to Vioxx, started him on Flexeril, and increased his Amitriptyline dosage.  (R. 192)  The repeat MRI was performed on May 3, 2001.  It showed no significant change in Higgins's left-side lumbar spine that would correlate with his symptoms.  The study showed "[m]ild L3-4 and moderate L2-3 disk dessication with both levels showing bulging annulus, unchanged"; and "[m]inimal disk space narrowing L4-5."  (R. 191)

On May 7, 2001, Higgins returned to see P.A. Faldmo for follow-up.  Higgins stated he had been to the ER a week earlier, and according to Higgins, the ER doctor had prescribed Hydrocodone after consulting with Dr. Clark.  Higgins stated he was frustrated and believed he needed surgery.  He requested referral to an orthopedic surgeon.  He stated he had stopped his physical therapy after two sessions due to pain, and none of the pain medications were helping him.  Examination revealed muscle spasms in Higgins's left lower lumbar area, and positive straight-leg-raising on the left at thirty degrees. P.A. Faldmo administered an injection of Toradol.  He planned to consult with Dr. Clark about Higgins's further treatment.  (R. 279)

Higgins was seen at the Pain Management Center on May 8, 2001.  Examination showed Higgins had decreased sensation to cold throughout his left leg; mildly decreased strength in his left leg, "most probably secondary to pain"; and positive straight-leg-raising

and "questionable Patrick's sign[6] positive" on his left leg.  (R. 268)  He received an epidural steroid injection under IV sedation.  He was restarted on Neurontin.  (R. 269)

On May 21, 2001, P.A. Faldmo referred Higgins to a "Dr. Porter" for evaluation of his chronic back pain with radiation down his left leg.  (R. 278)  An appointment was made for Higgins on June 7, 2001.  (*Id.*)  However, no records of that examination appear in the administrative record.  On June 26, 2001, Higgins's wife called SCHC regarding follow-up after Higgins's referral to the surgeon.  She was informed that P.A. Faldmo was out of the office until July 2, 2001.  (R. 279)

On July 3, 2001, P.A. Faldmo noted Higgins was scheduled to see a "Dr. Herrea" on July 24, 2001.  Higgins was directed to come to SCHC to sign a release of information to Dr. Herrea.  (R. 276)  The clinic called Higgins on July 16, 2001, to remind him to sign the release.  (*Id.*)  He apparently did so, and on August 8, 2001, information was faxed to J. Michael Donohue, M.D.  (*Id.*)

Higgins was referred to Dr. Donohue at Back Care, Inc. "for evaluation of a chief complaint of low back pain and bilateral leg pain."  (R. 254)  Dr. Donohue examined Higgins on August 13, 2001.  Higgins stated he had been employed as a cook at McDonald's, but he had been unable to work since his accident in February 2001.  He stated his pain was "aggravated by standing, walking, sitting, lying down[] at night, bending, lifting, getting up from a chair, doing housework, coughing, and sneezing."  (*Id.*)  Dr. Donohue assessed Higgins as having "significant lumbar dysfunction – normal neurological evaluation and MRI scan times two negative for any type of surgical lesion."  (R. 256)  He recommended Higgins "attempt a more aggressive monitored rehabilitation program," that would entail physical therapy three times weekly for six to eight weeks,

---

[6]In "Patrick's test," the patient lies supine, with the knee on the affected side flexed to 90 degrees and the foot on the flexed leg resting on the opposite knee.  The examiner externally rotates the hip on the affected side.  If the patient experiences pain on external hip rotation, this may indicate sacroiliitis.  *See* "Family Practice Notebook" (www.fpnotebook.com).

with a goal of strengthening his lumbar musculature. He noted Higgins would have to attend the sessions regularly and put forth maximal effort to complete the program satisfactorily. He assessed Higgins's prognosis as "quite guarded based on initial presentation." (*Id.*) Higgins planned to start his treatment the following week after he arranged transportation. (*Id.*)

Higgins began his physical therapy treatments on August 20, 2001. (R. 252-53) He cancelled his sessions on August 22 and 23, due to illness (R. 251-52), and attended sessions on August 24, 27, 29 and 31. (R. 248-51) He appeared for his session on September 4, 2001, but did not leave the waiting room. He stated he and his spouse were separating and notes indicate Higgins "appear[ed] quite downtrodden and indicate[d] that he [had] not eaten over the past four days and [had] only gotten approximately one hour of sleep." (R. 247) He rescheduled his session for the next day. When he returned on September 5, 2001, he put forth minimal effort on the bike and treadmill, and then he elected not to continue the treatment. He stated he still was not eating or sleeping. The physical therapist informed Higgins that he would not benefit from physical therapy unless he was willing to put forth his best effort. (*Id.*)

Higgins resumed his physical therapy sessions on September 7 and also attended a session on September 10. (R. 245-51) Notes indicates that during his seven physical therapy sessions, Higgins experienced low back pain and exhibited signs of deconditioning. He maintained a slow-stepping, narrow gait pattern with give-way at the knees. According to Higgins, after his session on September 5, he had collapsed and had been given an IV in the ER for twelve hours to allow him to sleep. He planned to begin marriage counseling in the near future. (R. 246)

Higgins saw Dr. Donohue for follow-up on September 10, 2001. The doctor recommended Higgins continue with physical therapy three times weekly. Higgins stated he would be on vacation the following week, but he would work on "his home Lifeline

program." (R. 244) Higgins missed his next physical therapy appointment on September 18, 2001, but his mother called to report that Higgins was traveling back home from Colorado. (R. 243) Higgins resumed his physical therapy on September 19, 2001, after a nine-day absence due to his trip to Colorado. When he arrived at the session, he stated his low back pain had worsened; however, he "demonstrate[d] several objective improvement measures . . . compared to his previous status of 9/10/01." (*Id.*) He had demonstrably significant improvement in his ability to tolerate forward flexion, as well as improvement in his torso rotation range of motion. He was encouraged to use ice on painful areas and to walk for increasingly longer periods. (*Id.*)

Higgins appeared for his next session on September 21, 2001, complaining of increased back pain. He was moving "very slowly with short-stepped gait pattern and give-way weakness with both knees." (R. 242) He started his warm-up routine but then decided he could not complete the rehab session. The therapist observed the following: "Patient was noted, following rehab, to be in a squatted position resting against a pillar smoking a cigarette, reportedly waiting for someone to pick him up." (*Id.*)

Higgins appeared for physical therapy sessions on September 24, 26, and 28, and October 1, 3, 5, and 8, 2001. (R. 236-41) Notes indicate he exhibited inconsistent effort in his exercises, as well as inconsistent gait pattern "particularly relating to a shifting between right and left lower extremity with give-way knee weakness." (R. 241) On occasion, he demonstrated "extremely poor repeat test effort." (*Id.*) He nevertheless exhibited significant increases in his work output scores, ranges of motion, and strength by October 1, 2001. (R. 239) At his session on October 3, 2001, Higgins reported he had not slept for two days due to pain in his low back, extending down through his entire left leg and foot. He apparently had called to talk with the physical therapist about "his frustration of increased pain in the last two weeks since he experienced a pop in his

back[.]" (R. 238) His test scores were down during this session, but were back up again at his October 5th session. (R. 237-38)

Dr. Donohue saw Higgins for follow-up on October 8, 2001. Higgins exhibited improved forward flexion to sixty degrees "with moderate jerking and grimacing." (R. 235) He showed moderate gains in strength, but still was well below normative values. The doctor noted Higgins's subjective complaints outweighed the objective findings, although Higgins did have some identified deficits. Dr. Donohue recommended Higgins continue with physical therapy for another two weeks, noting Higgins "should be considered disabled until follow-up." (*Id.*)

Higgins attended physical therapy sessions on October 10, 12, 15, 17, 19, 22, and 24, 2001. (R. 230-34, 236) Notes indicate his exercise output remained inconsistent, although Higgins continued to insist he was providing full effort. His gait also varied considerably, with a give-way limp involving his left leg during warm-ups, but a give-way limp involving his right leg after exercise. Testing of his progress failed "to reveal a significant pattern of gain or decline based on inconsistencies in test effort." (R. 232) By October 17, 2001, his output was "well below his previous best test mark of 9/19/01," although the therapist thought Higgins was putting forth a better effort on 10/17/01 than he did on 9/19/01. (R. 232) Higgins also exhibited "[o]ver-reactive behavior . . . throughout his course of rehab despite repeat encouragement to exercise with full effort." (*Id.*)

Dr. Donohue saw Higgins for follow-up on October 22, 2001. He noted Higgins's subjective complaints continued to outweigh the objective findings. He recommended Higgins complete his rehabilitation program during the next week. He noted all of Higgins's past work had involved heavy physical labor, and Higgins expressed a desire to change occupations. (R. 228) Dr. Donohue recommended a Functional Capacity

Evaluation be obtained after Higgins completed his rehab.  He noted Higgins's prognosis remained "very guarded."  (R. 229)

Higgins attended additional physical therapy sessions on October 26 and 29, 2001, and was discharged from formal rehab with instructions for a home exercise program. (R. 226-27)  He returned on October 30, 2001, for a Functional Capacity Evaluation ("FCE").  (*See* R. 200-225)  The evaluator found Higgins was able "to work at the SEDENTARY-Light Physical Demand Level for an 8 hour day," although the evaluator indicated Higgins had put forth less than maximal effort.  As a result, he opined this would be Higgins's "minimal functional ability," and he estimated Higgins "should be able to work at the LIGHT Physical Demand Level."  (R. 200)  Even then, he noted this likely was "a conservative estimate," indicating that "[d]ue to a significant percentage of failed validity criteria during [the] exam, [Higgins's] true functional ability must be left to professional conjecture."  (*Id.*)

Dr. Donohue saw Higgins for follow-up on November 5, 2001.  The doctor reviewed the FCE with Higgins, summarizing the findings as follows:

> With respect to work, the patient will have no restrictions on sitting, standing, or walking.  He may bend, reach, squat, or kneel on a frequent basis.  He should limit crawling or climbing to an occasional basis.  He may utilize his upper and lower extremities for light controls.  The patient's Physical Demand Classification of Worker would place him in the LIGHT Category.  He may occasionally lift 20 pounds, frequently lift 10 pounds, and should avoid constant lifting.

(R. 199)  Dr. Donohue further advised Higgins as follows:

> I relayed to the patient that based on his poor effort with respect to the FCE as well as on the basis of significant pain behavior that persists, the patient should look at the results of this test as a starting point with respect to return to work activities.  I further relayed to him that based on his previous examinations and MRI scan, I do not know of any other treatment options for him.  I relayed to him that I certainly

17

> have no objection to him seeking another opinion but that my
> current opinion with reasonable medical certainty is that his
> current symptomatology will resolve with time. . . . Prognosis
> remains quite guarded.

(*Id.*) Higgins was scheduled for follow-up and repeat testing of his lumbar extensor strength in four weeks, to evaluate how he was doing on his home exercise program. (*Id.*)

Dr. Donohue saw Higgins for follow-up on December 3, 2001. (R. 196-98) Higgins stated his symptoms largely were unchanged, and he continued to have back pain and decreased sensation in his left leg from hip to toe. Dr. Donohue noted Higgins had "an intermittent limp when weight bearing that varie[d] from right to left." (R. 196) Once again, Higgins exhibited "significant variation in effort on . . . test[ing] indicating submaximal effort." (*Id.*) Dr. Donohue opined Higgins had not sustained any impairment attributable to his February 2001 auto accident. (*Id.*) He further opined Higgins had reached maximal medical improvement. He found the work restrictions stated in the FCE would be a good starting point, but he anticipated that ultimately, Higgins would "improve to the point that he will not require any restrictions," although he could not place a time frame on this level of improvement. (R. 197)

On February 27, 2002, Jan Hunter, D.O. reviewed the record and completed a Physical Residual Functional Capacity Assessment form concerning Higgins. (R. 257-62) Dr. Hunter found Higgins should be able to lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; and push/pull without limitation. (R. 258) The doctor found Higgins occasionally could climb, balance, stoop, kneel, crouch, or crawl, and he would have no manipulative, visual, communicative, or environmental limitations, other than avoidance of concentrated exposure to noise. (R. 259-61) Dr. Hunter found Higgins's allegations of functional restrictions due to back pain were not fully supported by the medical evidence. (R. 261) Th doctor found Higgins's allegation that he can only sit for ten minutes at a time and walk

for one-half a block to be undermined by the FCE and by Dr. Donohue's formal examinations, both of which indicated Higgins was "capable of performing light type work activity with no restrictions in walking, standing, or sitting." (R. 262)

On September 25, 2002, Higgins went to the emergency room complaining that he had injured his right foot the previous night "when he slipped and fell into a cattle hole." (R. 265) He complained of severe pain in his right foot and ankle, worse with weight-bearing, and difficulty walking. He was diagnosed with a sprained right foot and ankle, and told to use ice, an Ace bandage, elevation, and crutches as needed. He was given Lortab while in the ER, but stated it did not really help his pain. Doctors prescribed Ibuprofen and Lortab for pain, and put his ankle in an air splint, which he was directed to wear for six weeks. Notes also indicate he was told not to work "for a couple of days." (*Id.*)

On December 4, 2002, Higgins was seen by Eileen M. Barto, M.D. "at the request of the State of Iowa Disability Determination Services Bureau for comprehensive examination and report." (R. 293) On examination, Dr. Barto noted the following objective indicators to support Higgins's claims of pain in his low back and left leg, and decreased sensation in his left leg: (1) "decreased strength in the left leg in resistance testing in that he had weakness secondary to pain on resistance"; (2) "some tenderness of the lumbar spine to palpation and obvious paravertebral muscle spasm and decreased range of motion in the lumbar spine"; (3) positive straight-leg-raising test on the left; (4) "decreased vibratory sense on the left as well as diminished pin prick sensation on the left"; and (5) Higgins "walk[ed] with a cane with decreased flexion of the left knee with a stiff legged gait." (R. 295) Dr. Barto assessed Higgins with "[m]usculoskeletal low back pain with apparent radicular symptoms into the left leg suggestive of nerve root dysfunction on the left"; "[m]uscle spasm of the low back"; and "[l]eft ear deafness, per patient's report, no hearing evaluation records are available at this time." (*Id.*)

19

Based on her examination and on Higgins's reported history, Dr. Barto made the following findings regarding Higgins's functional abilities:

> Mr. Higgins has had very little in the form of further evaluation and treatment for his low back and left leg symptoms in the past year and a half. Currently, he has very limited functional capacity, which I would expect would improve with appropriate medical treatment.
>
> At his current level of functioning, he would be quite limited in regard to walking, sitting or standing, for any even short periods of time, having to change positions frequently. He would be unable to do any lifting or carrying, stooping, climbing, kneeling or crawling. Though he may have left ear deafness, he certainly hears well in the exam room when I am talking with him, though he may have more problems if there were background noises involved. Grip strength is good, he should have no problems with handling objects, seeing, speaking, but traveling would be a difficulty due to his pain with sitting for extended periods of time. I would not have concerns regarding exposures in work environment such as to dust, fumes or temperatures. Again, I think this gentleman certainly has some improvement that could be done with appropriate medical management, but at his current state has numerous limitations as noted above.

(R. 295-96)

On February 5, 2003, Claude H. Koons, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 301-08) He found Higgins should be able to lift twenty pounds occasionally and ten pounds frequently; six, stand, or walk for about six hours in an eight-hour workday; and push/pull without limitation. He opined Higgins could do all postural activities occasionally, except he should avoid climbing ladders, ropes, and scaffolds. He noted Higgins is deaf in his left ear, but he hears well from his right ear, and otherwise Higgins would not have any communicative limitations. He further found Higgins would have no manipulative, visual, or environmental limitations. (*Id.*) Dr. Koons noted Higgins had not told Dr. Barto, the

consultative examining physician, about Dr. Donohue's testing or functional capacity evaluation. (R. 307) In his review summary, Dr. Koons noted Higgins's "allegations are suspect following evaluation and comments by Dr. Donahue [sic] in the past, [and] likewise [Higgins] has not seen any additional medical personnel for relief from his alleged low back and left leg pain. His FCE done approximately one year ago was almost completely invalid and Dr. Donahue [sic] at that time noticed significant symptom magnification." (R. 300) On August 14, 2003, J.D. Wilson, M.D. reviewed the record and concurred in Dr. Koons's assessment. (R. 308) Dr. Wilson noted Higgins and his attorney had failed to return requested forms, and DDS was "unaware of any new allegations or worsening of [Higgins's] condition." (R. 309)

Higgins was seen for an intake evaluation at Siouxland Mental Health ("SMH") on February 24, 2003. Higgins complained of worsening depression. He stated his family doctor had prescribed Zoloft in the past, but Higgins had quit taking it because he felt it was not helping him. Higgins stated he was withdrawing from people, had no friends, spent a lot of time alone in his room, felt worthless, had trouble sleeping, and had constant diarrhea. He stated he was seeing "Dr. Faldmo"[7] and felt "Dr. Faldmo" was "worthless," and would not give him any pain medications. Higgins was scheduled for individual therapy sessions. (R. 310-11)

Higgins saw Verna Halligan, LISW, at SMH on March 13, 2003, for an intake evaluation to begin his individual therapy. (R. 312-16) Ms. Halligan noted Higgins was cooperative and appeared to want help for himself. He exhibited a depressed affect and mood. Higgins reported sleep problems, fluctuating appetite due to back pain, and trouble concentrating. Based on her evaluation of Higgins, Ms. Halligan diagnosed him with "Major Depressive Disorder, recurrent, Moderate; [and] Alcohol Dependence in Full Remission." (R. 315) She assessed his current GAF at 50, indicating serious symptoms

---

[7]"Dr. Faldmo" is P.A. Faldmo at SCHC.

or serious impairment with social and occupational functioning. She recommended individual therapy. (R. 316)

Higgins was assigned to social worker Gary E. Lewis, LISW, for his individual therapy. He saw Mr. Lewis for therapy on March 18, 2003. (R. 317) On March 22, 2003, he began seeing Philip J. Muller, D.O. for medication management and overall management of his therapy. (R. 318-20) Dr. Muller diagnosed Higgins with bipolar disorder type II. He prescribed Trileptal and Paxil. Dr. Muller advised Higgins that he should not be taking Paxil without also taking the Trileptal, which is a mood stabilizer, because of the potential for hypomania or mania with the Paxil. (R. 319)

Higgins returned to see Mr. Lewis on April 2, 2003. Higgins appeared to be more relaxed at the end of his session, and his next visit was scheduled in two weeks. (R. 321) On April 12, 2003, Higgins saw Dr. Muller for follow-up. He stated he had "noticed some slight difference with the Trileptal and some mood instability, but he [was] still having mood swings yet at [that] time." (R. 322) His dosage of Trileptal was increased. (*Id.*) Higgins had additional therapy sessions with Mr. Lewis on April 16 and 30, 2003. Higgins continued to discuss his depression and personal goals, and he stated he thought his medications were beginning to help somewhat. (R. 323-24) He saw Dr. Muller again on April 30, 2003. Higgins stated he had some problems with mood instability, and he was still having some sleep difficulties. Dr. Muller increased Higgins's Trileptal dosage again, and directed him to return for follow-up in six weeks. (R. 325)

Higgins next saw Mr. Lewis on June 4, 2003. The therapist noted the following impressions:

> [Higgins] struggles with anger and physcial [sic] pain nearly all the time. He has not received the SSD yet, lives with his parents who appear to be avoiding their own need to decide what to do with the family farm (his father is 79). His daughter Amber also resides there [and] has a baby.

(R. 326) Another therapy session was scheduled in two weeks. (*Id.*)

Higgins returned to see Dr. Muller on June 11, 2003. His symptoms had not improved since his previous visit, and the doctor again increased Higgins's Trileptal dosage. (R. 327) When he next saw Dr. Muller, on July 23, 2003, Higgins was upset because he had lost his Title XIX funding. He was unaware that he could obtain his medications through the mental health center, and Dr. Muller explained the process to him. (R. 328) Higgins saw Dr. Muller again on August 20, 2003. He expressed difficulty with concentration, but stated his mood was somewhat better. His Paxil dosage was increased. (R. 329) At his next appointment on September 24, 2003, the doctor noted Higgins had misunderstood his directions and had increased his Paxil dosage to two tablets per day. However, because Higgins stated he was feeling better, the doctor had him continue on that dosage. (R. 330)

Higgins went to the emergency room on October 26, 2003, complaining of severe bilateral leg pain. He reportedly had been kicked in his left shin by a cow about five days earlier, and his left leg pain had increased gradually since then. On this date, pain also had begun in his right leg. He stated he had taken some Tylenol without relief, and noted he had taken pain medications in the past but nothing really helped his chronic pain. Higgins received IV Toradol and morphine in the ER, and after this treatment, the doctor noted Higgins was feeling much better and his pain had subsided enough that he could carry on a normal conversation. He was given a prescription for six Lortab to use overnight, and was directed to follow up at the clinic the next morning for further evaluation. (R. 357-58)

On October 27, 2003, Higgins saw Kurt Rosenkrans, M.D. at the Family Practice Center for follow-up. X-rays of Higgins's left lower leg and knee showed no fracture or abnormality. He had soft tissue swelling around his ankle. The doctor prescribed Keflex, Tylenol, elevation of the leg, and a follow-up visit the next day. (R. 363, 369) Higgins returned the next day reporting little improvement in his pain. He was scheduled for some testing, and for a return visit the next day. (R. 369) When he returned on October 29,

2003, Higgins still had little improvement.  He reported some diarrhea since starting the antibiotics.  On examination, his left leg showed significant swelling and tenderness.  He was directed to stay on the antibiotics and return for follow-up.  (R. 368)

Higgins went to the emergency room on November 4, 2003, and was admitted into the hospital for treatment of his left leg.  (R. 359-61)  He was having chills and leg pain, with some dry heaves and diarrhea.  He had "redness, swelling and tenderness in the lower extremities bilaterally."  (R. 361)  He was started on IV antibiotics, pain medication, Prevacid, and other medications, and lab tests and X-rays were ordered.  (*Id.*)  X-rays indicated only soft tissue swelling with no fractures, joint effusion, or other abnormalities.  (R. 353-56)  He was discharged from the hospital on November 6, 2003, with a diagnosis of "Bilateral lower extremity swelling, redness and erythema, probable gout, rule out cellulitis," and secondary diagnoses of depression and bipolar disorder.  (R. 350)  His pain was greatly improved.  He was directed to follow up with Dr. Rosenkrans in a few days.  (*Id.*; *see* R. 367)  His treating physician in the hospital opined Higgins "most probably did have an acute attack of gout and should he have had any cellulitis this would be cleared up by the antibiotics."  (R. 367)

Higgins saw Dr. Rosenkrans on November 11, 2003, for follow-up.  He stated he was "50% better."  (R. 351)  His left leg was less swollen.  He was directed to keep his feet elevated and to continue with his antibiotics.  (*Id.*)

Higgins returned to see Dr. Muller on November 19, 2003.  He had missed a scheduled appointment with Dr. Muller on November 5, 2003, while he was in the hospital.  He reported "doing okay on his medications," but expressed frustration because of his financial situation.  Dr. Muller indicated his office would attempt to straighten out the funding for Higgins's medications.  (R. 332; *see* R. 331)  Higgins saw Dr. Muller again on January 7, 2004.  He was upset because his child support had been increased.

Dr. Muller indicated he would set Higgins up again with Mr. Lewis for continued therapy. Higgins continued to take Trileptal and Paxil. (R. 333)

Higgins saw Mr. Lewis for counseling on January 9, 2004. Higgins stated his medications were helpful. He expressed frustration and helplessness because of his dependence on others for financial support. He was scheduled for follow-up in two weeks. (R. 334)

Higgins returned to see Dr. Muller on January 21, 2004. He stated he was "feeling closed in, claustrophobic at times." (R. 335) Dr. Muller increased Higgins's Paxil dosage, continued him on Trileptal, and directed him to continue seeing Mr. Lewis for counseling. (*Id.*) Higgins cancelled his appointment with Mr. Lewis scheduled for January 26, 2004. (R. 336) He saw Mr. Lewis again on January 28, 2004, and reported feelings of agitation, helplessness, and claustrophobia. Mr. Lewis directed Higgins to return for weekly sessions to prevent his condition from worsening. (R. 337) Higgins showed no improvement in his mild to moderate depression at his next session on February 4, 2004. He noted he was "helping his aged parents with chores this winter," but otherwise he felt helpless. (R. 338) He saw Dr. Muller the same day, and his Paxil dosage was increased again in an attempt to deal with his anxiety and claustrophobia. (R. 339)

Higgins next saw Mr. Lewis on February 18, 2004. He expressed feelings of agitation, anxiety, and depression incident to comments made to him by his mother. Mr. Lewis suggested Higgins share his feelings at his appointment with Dr. Muller, but it is not clear that Higgins did so. (R. 340; *see* R. 341) Dr. Muller continued Higgins on Trileptal and Paxil, and added Ativan to his medication regimen. He advised Higgins that he would be leaving the clinic in four weeks, and Higgins would be assigned to another psychiatrist for follow-up. (R. 341)

Higgins cancelled his appointment with Mr. Lewis on March 3, 2004, and next saw his counselor on March 9, 2004. (R. 342-43) He continued to see Mr. Lewis regularly, with sessions on March 10 and 29; April 12; and May 3 and 25, 2004. (R. 345-49) In addition, he saw Dr. Muller on March 10, 2004. (R. 344) During this time period, Higgins continued to express feelings of anxiety and claustrophobia, difficulty sleeping, and frustration with his parents' expectation that he would keep up their farm. His parents came with him to the session, and he suggested to them that they sell their farm and move into town, noting the responsibility of keeping up the farm was "too much to worry about." (R. 346) Higgins demonstrated agitation and anger, and continued to struggle with coping. His parents eventually did sell their farm, and Higgins felt he was to blame for their inability to keep the farm. Mr. Lewis noted, "Emotionally [Higgins] is chronicly [sic] depressed and not able to respond well to the meds, though would probably function worse without them." (R. 348) Higgins was encouraged to seek help should he feel suicidal. (*Id.*)

On June 17, 2004, Dr. Rosenkrans completed a Treating Medical Source Statement form regarding Higgins's impairments. He opined Higgins could sit for no more than fifteen minutes at a time before he would have to stand or walk about for up to fifteen minutes. He stated Higgins could sit for no more than two hours total in an eight-hour work day. He indicated Higgins could stand or walk about continuously for no more than fifteen minutes at a time before he would have to lie down or recline for fifteen minutes, and Higgins could not stand or walk about for more than one hour total in an eight-hour work day. He stated Higgins would have to rest lying down or reclining for two hours in an eight-hour work day to relieve pain arising from his medical impairments. The doctor further opined Higgins could lift and carry up to twenty pounds occasionally, and use his hands for reaching, handling, and fingering activities for more than two-thirds of an eight-hour day. He stated Higgins could stoop only rarely. He noted that Higgins's

impairments were likely to produce "good days" and "bad days," and he estimated Higgins would miss work due to his impairments or treatments more than four times per month. He listed Higgins's diagnoses as bipolar disorder, chronic low back pain, and a history of lumbar radiculopathy.[8]  (R. 371-74)

### 3.    The ALJ's decision

The ALJ found Higgins had not engaged in substantial gainful activity since his alleged disability onset date of February 1, 2001.  He found Higgins has severe impairments consisting of residual back dysfunction from his motor vehicle accident, and bipolar disorder.  However, he found these impairments, singly or in combination, do not meet or equal the listing criteria.  (R. 15-16)

The ALJ relied on the opinions of Dr. Donohue and the state agency consultants in determining that Higgins has the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for six hours in an eight-hour day; and occasionally climb ramps and stairs (but avoid climbing ladders, ropes, and scaffolds), balance, stoop, kneel, crouch, and crawl.  The ALJ gave little weight to Dr. Barto's opinion that Higgins would be unable to lift, carry, stoop, climb, kneel, or crawl, because she only examined Higgins once, and further, she opined Higgins's condition would improve with proper medical treatment.  (R. 19; *see* R. 16-19)

The ALJ also discounted the treating source statement provided by Dr. Rosenkrans, stating the doctor "apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Higgins], and seemed to uncritically accept as true most, if not all, of what [Higgins] reported."  (R. 19)  The ALJ noted Dr. Rosenkrans only treated Higgins for one occurrence of gout, and the injury to his left leg from being kicked by a

---

[8] One additional diagnosis is listed, but it is not entirely legible, to-wit: "Non-specific [illegible] disorder."  (R. 374)

cow. The ALJ found the doctor's opinion was "an accommodation relying in part on an assessment of impairments for which [Higgins] received no treatment from him." (*Id.*)

Based on the opinions of the non-examining physicians and the FCE performed by Dr. Donohue, the ALJ found Higgins's allegations of disabling limitations were not fully credible. He found that although Higgins is unable to perform any of his past relevant work, or even to perform medium work, he nevertheless could make a successful adjustment to the full range of light work. The ALJ applied Medical Vocational Rule 202.21 in concluding Higgins is not disabled. (R. 19-20)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity.

If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a

medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not

disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence

appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)    the claimant's daily activities;
> 2)    the duration, frequency and intensity of the pain;
> 3)    precipitating and aggravating factors;
> 4)    dosage, effectiveness and side effects of medication;
> 5)    functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV.  ANALYSIS

Higgins argues the ALJ erred in failing to obtain the testimony of a vocational expert because Higgins has non-exertional limitations that must be considered in evaluating his functional capacity.  He argues the ALJ only considered his exertional limitations, which then allowed the ALJ to use the Medical-Vocational Guidelines to conclude Higgins is not disabled.  Higgins asserts the Regulations require the ALJ to consider the effect of Higgins's non-exertional mental limitations on his ability to work, and the ALJ erred in failing to do so.  Higgins similarly asserts the ALJ failed to consider the effects of his hearing loss and his learning disability on his functional capacity.  (*See* Doc. No. 9)

The Commissioner notes, first, that the record does not contain substantial evidence to support a conclusion that Higgins's hearing loss and learning disability were severe impairments.  Because the ALJ did not find those impairments to be severe, he did not have to consider their impact on Higgins's functional capacity.  The court agrees that the record does not support a conclusion that Higgins's hearing loss or learning disability were severe impairments.

The Commissioner also argues the ALJ properly discounted the opinions of Drs. Barto and Rosenkrans for the reasons stated in the ALJ's opinion.  The Commissioner further argues the ALJ properly found Higgins's subjective complaints of disabling limitations were not credible.  (*See* Doc. No. 10)

Both the ALJ, in his opinion, and the Commissioner in her current brief assert it was proper for the ALJ to discount the opinions of Dr. Barto because Higgins did not tell Dr. Barto about his prior FCE and Dr. Donohue's opinions.  However, the court notes Dr. Barto saw Higgins a full year after he concluded his treatment with Dr. Donohue, and after he had suffered an additional injury when he stepped in a hole.  Dr. Barto's examination revealed objective findings including muscle spasms, which likely could not be faked by Higgins, and decreased sensation in his left leg, which had been documented

previously. The court does not find Higgins's failure to tell Dr. Barto about the previous FCE impacted his credibility significantly, nor does Dr. Barto's ignorance of the prior FCE impact upon her opinion regarding Higgins's functional capacity based on her objective examination.

The ALJ also discounted the opinion of Higgins's treating physician Dr. Rosenkrans because, in the ALJ's opinion, the doctor "apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Higgins], and seemed to uncritically accept as true most, if not all, of what [Higgins] reported." (R. 19) Dr. Rosenkrans began treating Higgins in October 2003, when Higgins suffered an injury to his left shin when he was kicked by a cow. The doctor made objective findings of Higgins's condition that supported Higgins's claims of pain and limitations at that time. However, as the Commissioner notes, Dr. Rosenkrans also offered an opinion based on Higgins's mental and physical impairments that were not treated by the doctor, and his treating source statement does not indicate that he reviewed records from Higgins's other treating sources. Therefore, the court concludes the ALJ correctly gave Dr. Rosenkrans's opinion little weight.

As the Eighth Circuit Court of Appeals explained in *Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000):

> The opinion of a treating physician is accorded special deference under the social security regulations. The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Consistent with the regulations, we have stated that a treating physician's opinion is "normally entitled to great weight," *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999), but we have also cautioned that such an opinion "do[es] not automatically control, since the

record must be evaluated as a whole." *Bentley v. Shalala*, 52
F.3d 784, 785-86 (8th Cir. 1995). Accordingly, we have
upheld an ALJ's decision to discount or even disregard the
opinion of a treating physician where other medical assess-
ments "are supported by better or more thorough medical
evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.
1997), or where a treating physician renders inconsistent
opinions that undermine the credibility of such opinions, *see
Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

Whether the ALJ grants a treating physician's opinion
substantial or little weight, the regulations provide that the ALJ
must "always give good reasons" for the particular weight
given to a treating physician's evaluation. 20 C.F.R.
§ 404.1527(d)(2); *see also* SSR 96-2p.

*Prosch*, 201 F.3d at 1012-13; *accord Wiekamp v. Apfel*, 116 F. Supp. 2d. 1056 (N.D.
Iowa 2000) (Bennett, J.). In the present case, the court finds the ALJ gave good reasons
for discounting Dr. Rosenkrans's opinion.

Although the court might weigh the evidence differently on *de novo* review, as
noted above that is not the standard of review here. The court finds the record contains
substantial evidence to support the ALJ's conclusion that Higgins's *physical* impairments
do not render him disabled. However, the court does not reach the same conclusion with
respect to Higgins's mental impairments. The record contains no treating source
statement, no Psychiatric Review Technique, and no mental functional evaluation from
which the ALJ could determine that Higgins's mental impairment -- which the ALJ found
to be severe -- would allow Higgins to sustain competitive employment. An ALJ has a
duty to develop the record fully and fairly in order to make a proper determination of a
claimant's residual functional capacity from both physical and mental standpoints. *See,
e.g.*, *Nevland v. Apfel*, 204 F.2d 853 (8th Cir. 2000). The court finds it was improper for
the ALJ to rely solely on the regulations in finding Higgins not to be disabled, given the
ALJ's finding that Higgins has a non-exertional mental impairment. *See Hall v. Chater*,

62 F.3d 220, 224 (8th Cir. 1995) (ALJ must consider "vocational testimony or other similar evidence" when non-exertional impairments are present). The court finds the ALJ erred in failing to develop the record fully and fairly with regard to Higgins's mental limitations. On remand, this would include obtaining the testimony of a vocational expert or other similar evidence regarding the impact Higgins's mental impairment would have on his ability to work.

## V.  CONCLUSION

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[9] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed above.

**IT IS SO ORDERED.**

**DATED** this 29th day of March, 2006.

_____

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[9]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).